1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MONRELL D. MURPHY,                    No.  2:21-cv-1789 TLN CSK P

12                    Plaintiff,

13        v.                               FINDINGS & RECOMMENDATIONS

14   C. PIERCE, et al.,                    (ECF No. 61)

15                    Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se.  Defendants' fully briefed motion for

18   summary judgment is before the court.  As discussed below, defendants' motion should be

19   partially granted and partially denied.  In addition, following review of the record and the

20   evidence submitted concerning the exhaustion of administrative remedies, the Court sua sponte

21   recommends that the two Doe defendants be dismissed.

22   **I.       PLAINTIFF'S COMPLAINT**

23        In his verified complaint, plaintiff raises the following claims against defendants Pierce,

24   Lebeck, and Lopez:  (1) Eighth Amendment excessive force claims against defendants Pierce,

25   Lebeck, and Lopez; (2) Eighth Amendment deliberate indifference to plaintiff's serious mental

26   health needs claim against defendant Pierce; and (3) First Amendment retaliation claims against

27   / / /

28   / / /

                                          1

defendants Pierce and Lebeck.  Plaintiff's Complaint ("Compl.") (ECF No. 1).[1]  Defendant Pierce was a Sergeant at California State Prison, Sacramento ("CSP-SAC"), and defendants Lebeck and Lopez were Correctional Officers at CSP-SAC.

Specifically, plaintiff alleges the following.  On February 21, 2020, at CSP-SAC, plaintiff notified defendants Pierce and Lebeck that he was "feeling suicidal." (Compl. at D-1.)  Pierce allegedly responded, "go ahead kill yourself, I don[']t care." (Id.)  Lebeck also stated "I sure in the hell don[']t care, I don[']t think nobody would." (Id.)  Plaintiff asked to speak with mental health staff but did not receive a response. (Id.)  Without warning, defendants Pierce and Lebeck grabbed plaintiff's wrists, lifted him up, and slammed him into the pavement, "coming down on his upper and lower back with their full weight." (Id.)

"At no time did [plaintiff] resist defendants Pierce and Lebeck." (Id.)  While lying on the ground restrained, Pierce "repeatedly punched [] Plaintiff [in] the back of his head and upper torso" while Lebeck grabbed plaintiff's "scrotum and repeatedly yanked and twisted on them with violent force." (Id.)  When defendant Lopez arrived, he kicked plaintiff repeatedly in the legs. (Id.)  After the beating, Lopez handcuffed and placed leg irons on plaintiff. (Id. at D-2.)  Lebeck allegedly stated "When we finish with your black ass you are gonna wish you was dead . . . you want to cry to the Ombudsman, we'll give you something to cry about." (Id.)  Plaintiff felt threatened, understanding that Lebeck was referring to his prior interview with CDCR Ombudsman Xina Bolden to report officer misconduct. (Id.)

Because plaintiff was unable to stand due to his injuries, defendants placed plaintiff on a gurney and carried him to Facility B. (Id.)  Pierce ordered plaintiff into a standing room only holding cell, and plaintiff notified Pierce that plaintiff "was in extreme pain and needed medical attention." (Id.)  Ignoring plaintiff's pleas for help, Pierce allegedly said "get in the cage or I[']m gonna put you in head first." (Id.)  Pierce grabbed plaintiff and violently slammed him into the holding cage. (Id.)  Because plaintiff could not stand, defendants were unable to close the

---

[1]  In addition, plaintiff included allegations as to a "defendant Ortega," but such claims were dismissed on February 24, 2023 (ECF No. 39), based on plaintiff's election (ECF No. 38).  Plaintiff also included two Doe defendants who are addressed in the "Leave to Amend" section below.

holding cage door and placed plaintiff back on the gurney to be taken to medical.  (Id. at D-2-D-3.)

At medical, plaintiff was treated for his injuries, given pain medication, and instructed to stay off his feet and rest.  (Id. at D-3.)  Some time later, plaintiff was transported back to Facility B on a gurney.  (Id.)  In Facility B, defendant Pierce allegedly grabbed plaintiff while he was restrained, slammed him into the back of another standing room only holding cage, and then put him back on the gurney.  (Id.)  Plaintiff told an arriving correctional sergeant that plaintiff wanted to make an excessive force complaint.  (Id.)  Pierce then allegedly stated "you wanna [write] me up . . . I[']m gonna beat you to the punch and write you up for resisting and battery and send your monkey ass to the hole."  (Id.)  In response to plaintiff's statement that video cameras captured the incident, Pierce allegedly stated "I know how to set you up cause I know where all the blind spots are."  (Id.)

Plaintiff was taken to an isolation room where defendant Pierce allegedly told other officers to "turn him on his belly, grab some sheets and tie his ass in a stress position."  (Id. at D-4.)  When plaintiff was flipped on his belly, Pierce pummeled him in the back of the head.  (Id.)  After another officer tied him up, Pierce responded, "no[,] tie it tighter around the ribs."  (Id.)  Pierce allegedly told a mental health clinician that "Inmate Murphy says he [is] suicidal . . . leave him tied up like this long enough and he will wish he was dead, but won't be able to move to do it."  (Id. at D-5.)  Plaintiff said he was in pain and could not breathe, but the clinician responded, "you should have thought about that before you made custody mad."  (Id.)  For six hours, "plaintiff was left in said stress position with his hands handcuffed behind his back and leg shackled, [lying] face down on said gurney tied down with sheets [wrapped] around his body from his upper neck to his feet, that was so tight it labored his breathing and caused his body joints to burn with extreme pain."  (Id. at D-4.)  He was subsequently transferred to administrative segregation, and sometime after, plaintiff attempted suicide.  (Id. at D-6.)

## II.      PROCEDURAL HISTORY

Plaintiff received two rules violations based on the February 21, 2020 incidents: (1) willfully resisting a peace officer based on plaintiff's refusal to return to his cell and to submit

to restraints (ECF No. 21-4, Ex. B at 24); and (2) battery on a peace officer based on a finding

that plaintiff kicked Pierce in the left ankle while plaintiff was being secured in a standing only

holding cell (id., Ex. A at 3).  Defendants previously filed a motion to dismiss plaintiff's claims as

barred by Heck v. Humphrey, 512 U.S. 477 (1994) and Edwards v. Balisok, 520 U.S. 641 (1997).

(ECF No. 21.)  The assigned magistrate judge found that plaintiff's claims were not barred under

Heck:

> Like in Hooper [v. County of San Diego, 629 F.3d 1127 (9th Cir.
> 2011)], plaintiff has alleged a factual scenario for his § 1983 claims
> that is not mutually exclusive with the prison disciplinary findings.
> As was the case in Hooper, defendants restrained plaintiff in one
> continuous chain of events, which involved two separate factual
> predicates, the first giving rise to plaintiff's disciplinary infractions,
> and the second giving rise to defendants' potential civil liability.
> Accepting all of the factual allegations in the complaint as true and
> construing them in plaintiff's favor, this Court finds that plaintiff has
> plausibly alleged that defendants acted in violation of the Eighth and
> First Amendments.  Because plaintiff could prevail on his § 1983
> claims without implying the invalidity of plaintiff's prison
> disciplinary infractions, Heck does not apply, and defendants'
> motion to dismiss the action as Heck-barred should be denied.

(ECF No. 31 at 8.)[2]  On December 15, 2022, the district court adopted the findings and

recommendations in full and denied the motion to dismiss.  (ECF No. 36.)

On October 16, 2023, defendants filed a motion to revoke plaintiff's in forma pauperis

status.  (ECF No. 50.)  On December 13, 2023, the assigned magistrate judge recommended that

the motion be denied.  (ECF No. 57.)  On February 6, 2024, the district court adopted the findings

and recommendations in full and denied the motion to revoke.  (ECF No. 63.)

## III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on the following grounds:  (1) plaintiff failed to

exhaust his administrative remedies as to his claim that defendant Pierce was deliberately

indifferent to plaintiff's medical needs; (2) the evidence demonstrates plaintiff sustained no

serious, visible injuries, demonstrating excessive force was not used; (3) inconsistencies among

---

[2]  Even if the court had found plaintiff's claims barred by Heck, the Ninth Circuit has found that Heck is a claims bar, not an evidentiary bar, and therefore does not bar plaintiff from presenting his version of events.  See Simpson v. Thomas, 528 F.3d 685, 696 (9th Cir. 2008) ("Heck is not an evidentiary doctrine").

1  plaintiff's allegations and contradictions to the factual record render his claims implausible;

2  (4) because defendants acted reasonably, they are also entitled to qualified immunity on

3  plaintiff's excessive force claims; (5) plaintiff cannot demonstrate defendants Pierce and Lebeck

4  used force against him in retaliation for his having complained to Ombudsman Bolden;

5  (6) defendant Pierce was not deliberately indifferent to plaintiff's serious medical needs, and

6  because defendant Pierce acted reasonably, he is entitled to qualified immunity; (7) because the

7  undisputed evidence shows that defendants did not act with evil motive or intent or reckless and

8  callous indifference to plaintiff's rights, defendants are entitled to summary judgment on

9  plaintiff's prayer for punitive damages; and (8) plaintiff cannot recover damages based on mental

10  or emotional distress because any physical injuries he sustained were de minimis.

11        A.     Legal Standards for Summary Judgment

12        Summary judgment is appropriate when it is demonstrated that the standard set forth in

13  Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

14  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

15  judgment as a matter of law."  Fed. R. Civ. P. 56(a).

16
17
18
19
> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

20  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

21  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

22  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

23  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

24  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

25  committee notes to 2010 amendments (recognizing that "a party who does not have the trial

26  burden of production may rely on a showing that a party who does have the trial burden cannot

27  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

28  should be entered, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled on other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes to 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By notice issued January 18, 2024, plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 61-10 (citing Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).)

B.    Video Evidence

Defendants submitted the following video evidence in support of their motion for summary judgment:  (1) the use of force interview video recorded at 6:50 p.m. on February 21, 2020, and (2) the video footage of the use of force during the third incident recorded around 1:32 p.m. on February 21, 2020, referred to as the "B Yard Breezeway."  Declaration of Lt. Andrade ("Andrade Decl.") ¶ 3, Ex. 1; Declaration of Correctional Officer Padilla ("Padilla Decl.") ¶ 3, Ex. 1.  The February 21, 2020 video-recorded interview of plaintiff was taken at approximately 6:50 p.m., after all of the use of force incidents.  Andrade Decl. ¶ 3, Ex. 1.  Lt. Andrade declares that the video footage is a true and correct copy of the videotaped interview of plaintiff which Lt. Andrade recorded during the evening of February 21, 2020, after plaintiff claimed that excessive force was used against him.  (Id.)  Lt. Andrade declares that the video is an MP4 file containing Exhibit 1 and is maintained by the CDCR as part of the incident reports prepared in connection with the use of force alleged by plaintiff.  (Id.)  The video runs from 0:00:00 to 00:09:13 and includes audio.

Defendants provided video evidence of the third use of force incident.  Padilla Decl. ¶ 3, Ex. 1 (B Yard Breezeway 1012 and B Yard Breezeway 1013 video).  Officer Padilla,

Correctional Officer in the Investigative Services Unit ("ISU") at CSP-SAC declares that the video footage is an MP4 file containing Exhibit 1 and is maintained by the California Department of Corrections and Rehabilitation as part of the incident reports prepared in connection with the use of force alleged by plaintiff.  (Id.)  The videos depict the B Yard Breezeway from two different angles:  the B Yard Breezeway 1012 video runs from 1:32:16:0005 to 1:35:12.586 PM; and the B Yard Breezeway 1013 video runs from 1:32:15:0004 to 1:35:12:560 PM.  The videos do not contain audio.  At the bottom left hand corner of the video screen is a "time elapsed" counter for the video clip to which the Court refers to for ease of reference.

The Supreme Court stated that when ruling on motions for summary judgment, courts "should [ ] view[ ] the facts in the light depicted by the videotape."  Scott v. Harris, 550 U.S. 372, 380-81 (2007) (following review of videotape, Court held deputy acted reasonably in terminating car chase and did not violate respondent's Fourth Amendment right against unreasonable seizure).  However, courts are still required to draw all reasonable inferences in the nonmovant's favor.  Vos v. City of Newport Beach, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in the light most favorable to the nonmovants . . . so long as their version of the facts is not blatantly contradicted by the video evidence."); Williams v. Las Vegas Metro. Police Dep't, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment:  in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing Blankenhorn v. City of Orange, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).  Thus, the Court considers the video footage, drawing all reasonable inferences in plaintiff's favor.

C.     Undisputed Facts ("UDF")

This case involves four incidents where force was used on plaintiff.  For ease of reference, the Court refers to such incidents in numerical order ("first incident," "second incident," etc.).  The first incident is based on the initial encounter involving defendants Pierce, Lebeck, and Lopez.  The second incident is the initial attempted placement of plaintiff in the standing only cell involving defendants Pierce and Lebeck.  The third incident is the second attempted placement of plaintiff in the standing only cell with video involving defendant Pierce.  The fourth incident is

when plaintiff was placed in stress restraints and challenges the actions of defendant Pierce.

For purposes of summary judgment, the undersigned finds the following facts are undisputed.

1. On February 21, 2020, plaintiff was housed in B Facility of CSP-SAC, which is a level IV housing unit, the highest security classification. Compl. at D-1; Declaration of Defendant Pierce ("Pierce Decl.") ¶ 3 (ECF No. 61-3); Declaration of Defendant Lebeck ("Lebeck Decl.") ¶ 3 (ECF No. 61-5); Declaration of Defendant Lopez ("Lopez Decl.") ¶ 3 (ECF No. 61-6); Cal. Code Regs. tit. 15 § 3377. All incidents alleged in this action occurred on February 21, 2020.

2. During the events alleged in this action, defendant Pierce was a sergeant and defendants Lebeck and Lopez were correctional officers at CSP-SAC. Pierce Decl. ¶ 3; Lebeck Decl. ¶ 2; Lopez Decl. ¶ 2.

3. During a use of force interview of plaintiff, which was recorded in CSP-SAC by video on February 21, 2020 after the fourth incident, when explaining how the incidents began, plaintiff said he was told that he had been reassigned to a cell with an inmate with whom he did not get along, there were hostilities, and the prospect of such assignment was bringing on PTSD ("post traumatic stress syndrome") symptoms. Declaration of Sgt. Andrade ("Andrade Decl.") ¶ 3, Ex. 1 (ECF No. 61-2);[3] Use of Force Interview Video at 5:37 - 6:50.

4. On February 21, 2020 at around 12:40 p.m., plaintiff informed defendants Pierce and Lebeck that he was feeling suicidal, which preceded the first incident. Compl. ¶ 2; Pierce Decl. ¶ 4; Lebeck Decl. ¶ 3; Lopez Decl. ¶ 4.

5. Following the first incident, plaintiff was seen at medical at approximately 12:44 p.m. on February 21, 2020. (ECF No. 65 at 10.)

6. After the second incident, plaintiff was again taken to medical. Compl. ¶¶ 9, 10; Pierce Decl. ¶¶ 15, 16; Lopez Decl. ¶ 11.

7. The second medical evaluation on February 21, 2020 took place at 1:06 p.m. The

---

[3] Sgt. Andrade also claimed that during the use of force interview video, plaintiff stated he was "upset and agitated when defendants encountered him," but plaintiff did not make that statement during the interview. Use of Force Interview Video, passim.

9

nurse recorded the following:

> Pt now complains of back pain 8/10 on scale with no visible bruising or signs of injury noted.  Pt does have minimal abrasions to bilat[eral] knee.  Pt is unable to perform hand grips and push pulls . . . [and] now states he cannot walk.  Vitals are stable and pt appears in no apparent distress at this time. . . .  Pt states he has neck tenderness upon the slightest touch, C collar in place.

Declaration of Deputy Attorney General Chase Goldstein ("Goldstein Decl."), Ex. 4 (ECF No. 68).[4]  The nurse spoke with Dr. Son who prescribed "Tylenol 650 mg TID PRN pain x 5 days with RN follow up in A.M."  Id., Ex. 5.  Plaintiff was medically cleared.

8.  During the third incident, which was video recorded, defendant Pierce attempted to place plaintiff in a holding cell.  Declaration of Padilla ("Padilla Decl."), Correctional Officer in the Investigative Services Unit, ¶ 3, Ex. 1 (ECF No. 61-8).  The third incident ended around 1:35 p.m.[5]

9.  After the third incident, defendant Pierce and nonparty Officer Ortega put plaintiff onto a rolling gurney.  Pierce Decl. ¶ 19, Pl. Compl. ¶ 12.[6]

10.  Defendant Pierce ordered correctional staff to restrain plaintiff.  Pierce Decl. ¶ 19; Pl. Compl. ¶¶ 15-16.

11.  At about 2:35 p.m., plaintiff was seen at medical a third time on February 21, 2020.  Goldstein Decl., Ex. 6.  Medical staff documented that plaintiff reported the circumstances of his injury as follows:  "I've been assaulted and ha[d] excessive force used on me."  Id.

---

[4]  Goldstein's exhibits 3 through 9 are filed under seal at ECF No. 68.

[5]  The B Yard Breezeway 1012 video runs from 1:32:16:0005 to 1:35:12.586 PM.  The B Yard Breezeway 1013 video runs from 1:32:15:0004 to 1:35:12:560 PM.

[6]  Plaintiff also alleges that defendant Pierce and nonparty Ortega "forcefully grab[b]ed [plaintiff] while still in restraints and violently and repeatedly slam[m]ed [plaintiff] against the back of another standing room only holding cage causing abrasions to the plaintiff's face," and once they were unable to put plaintiff in the cage, "slam[m]ed the plaintiff back onto said gurney."  Compl. ¶¶ 11, 12.  However, the video from the third incident rebuts plaintiff's claims that he was violently and repeatedly slammed into the back of the holding cell or slammed back onto the gurney.

12.  Plaintiff was restrained to the gurney for about an hour after the third incident.[7]  UDF 8, 11.

13.  At approximately 6:01 p.m.,[8] after attempting suicide by hanging, plaintiff was seen in medical a fourth time.  Goldstein Decl., Ex. 7.

14.  At about 6:45 p.m.,[9] plaintiff was seen in medical a fifth time.  Goldstein Decl., Ex. 8.

15.  At about 6:50 p.m., plaintiff was interviewed in response to his use of force claims.  Use of Force Interview Video.

16.  Prior to the injuries plaintiff alleges he sustained from defendants' alleged use of excessive force on February 21, 2020, plaintiff had a medical history of chronic low back pain, chronic idiopathic pain syndrome, chronic pain syndrome, and chronic pain throughout his body, including his neck, back and shoulder.  Goldstein Decl., Exs. 7, 9.

17.  The only grievance plaintiff submitted with claims similar to those he asserts in his complaint is appeal log no. SAC-20-00720 ("Grievance 720"), submitted on or about February 29, 2020.  Declaration of Howard E. Moseley ("Moseley Decl."), Associate Director of the Office of the Appeals, Ex. 3 (ECF No. 61-7 at 16-23).

18.  For purposes of exhaustion of administrative remedies only, the Court finds that plaintiff submitted Grievance 720, and set forth the following information within the grievance.  Plaintiff identified the subject of his appeal as "Excessive use of force/staff misconduct/PREA."  Moseley Decl., Ex. 3.  Plaintiff wrote:

---

[7]  Staff also recorded that plaintiff said, "I've been in the torture position for 2 hours."  Id.  However, because the third incident ended around 1:35 p.m., and he reported to medical around 2:35 p.m., the record evidence demonstrates that plaintiff was not held in the stress position for two hours.  Considering the video footage and the medical record, the Court finds it undisputed that plaintiff was restrained to the gurney for about an hour.  UDF 8, 11.

[8]  In the defendants' separate statement of undisputed facts, defendants claim the medical evaluation took place at about 5:01 p.m. and plaintiff did not dispute that time.  (ECF Nos. 61-9 at ¶ 17, 65 at ¶ 17.)  However, the medical record states service was rendered at 18:01 PST, which is 6:01 p.m.  Goldstein Decl., Ex. 7.

[9]  In the defendants' separate statement of undisputed facts, defendants state that the medical evaluation took place at about 5:01 p.m. and plaintiff did not dispute that time.  (ECF Nos. 61-9 at ¶ 17, 65 at ¶ 17.)  However, the medical record states plaintiff was seen at 18:45 PST, which is 6:45 p.m.  Goldstein Decl., Ex. 8.

On or about Feb. 22, 2020, at CSP-SAC B yard, in retaliation for participation in an interview [with] the mental health ombudsman and others, C/O Lebeck while [plaintiff] was on the yard, had inmate porters move all of [plaintiff's] property to cell B-1-201 with an inmate that [plaintiff] [is] not compatible with due to my diagnosed mental health issue. [Plaintiff] told C/O Lebeck that [plaintiff] was not compatible. To which he responded[,] "Your compatible with whoever I say you are and I don't care about your crying to the Coleman people . . . they don't run shit." [Plaintiff] then began to feel threatened by C/O Lebeck and [the prospective] cell mate and notified C/O Lebeck that [plaintiff] was having flashbacks and feeling suicidal. While in B-1 dayroom C/O Lebeck and Sgt. Pierce along with two other unidentified Sgt. and without warning C/O Lebeck and Sgt. Pierce grabbed and slammed [plaintiff] forcefully to the ground falling on [plaintiff's] neck and back with their full body weight. The other Sgt. then jumped in on [plaintiff's] back. Sgt. Pierce then yelled "stop resisting" and reached between [plaintiff's] legs and grabbed and twisted [plaintiff's] scrotum. [Plaintiff] was then handcuffed and shackled and taken to the program office area where [plaintiff] was experiencing extreme flashbacks. Sgt. Pierce and another Sgt. then grabbed [plaintiff] and tried to stuff [him] in a holding cage despite [plaintiff] not being able to stand and repeatedly battered [plaintiff]. [Plaintiff] was then tied down to a gurney on [his] stomach which labored [his] breathing for 4 hours where [plaintiff] urinated and defecated on [him]self. In ASU, [plaintiff] attempted suicide and when they came to cut [plaintiff] down, C/O Garcia punched [plaintiff's] head.

Moseley Decl., Ex. 3 (ECF No. 61-7 at 18-19).

  D. Disputed Facts ("DF")

The following facts are disputed.

1. Prior to the first incident, defendants declare that on February 21, 2020, at around 12:40 p.m., plaintiff also claimed he was homicidal. Pierce Decl. ¶ 4; Lebeck Decl. ¶ 3; Lopez Decl. ¶ 4.[10] Plaintiff denies that he felt homicidal or ever stated that he was homicidal. Plaintiff's Declaration ("Pl. Decl.") ¶ 6) (ECF No. 65 at 7.)

2. After plaintiff claimed he was suicidal, defendants declare they attempted to restrain plaintiff to take him for a mental health evaluation, but he refused. Pierce Decl. ¶¶ 4-9; Lebeck Decl. ¶¶ 3,4; Lopez Decl. ¶¶ 4-8. Plaintiff declares he was assaulted by defendants without warning or provocation, and denies he was ordered to return to his cell or submit to restraints.

---

[10] Defendants also cite plaintiff's complaint ¶ 2, to support their claim that plaintiff informed Pierce and Lebeck that plaintiff was feeling suicidal and homicidal. (ECF No. 65 at 10.) But plaintiff's complaint only alleges that plaintiff said he was "feeling suicidal." (ECF No. 1 at ¶ 2.)

1    Compl. ¶¶ 4, 5; Pl. Dep. 23:46.

2         3.   Defendants declare that following the first incident, plaintiff had a medical evaluation

3    that indicated he suffered no injuries as a result of the force used to restrain him, as reflected on

4    the 12:44 p.m. medical record.  Goldstein Decl. ¶ 5, Ex. 3; Pierce Decl. ¶ 10; Lebeck Decl. ¶ 5;

5    Lopez Decl. ¶ 9.  Plaintiff denies medical staff medically examined him but was instead "only

6    asked did I have a comment."  Pl. Decl. ¶ 7.  In his deposition, plaintiff testified he was not

7    medically evaluated, but only asked, "[a]re you all right?"  Pl. Dep. at 28:14.

8         4.   Defendant Lebeck declares he ceased to be involved in the incident before defendant

9    Pierce first attempted to put plaintiff in a holding cell (second incident).  Lebeck Decl. ¶¶ 3-6.

10   Plaintiff claims that defendant Lebeck was involved in the second incident.  Compl. ¶ 9.

11        5.   During the second incident, defendants Pierce and Lopez declare that when they and

12   nonparty Sgt. Valice attempted to put plaintiff in a holding cell, plaintiff violently and without

13   warning kicked off the back wall of the holding cell so they could not close the door behind him.

14   Pierce Decl. ¶¶ 12, 13; Lopez Decl. ¶ 10.  Plaintiff denies he kicked off the wall of the holding

15   cell at any time.  Pl. Decl. ¶ 4.

16        6.   Defendants claim plaintiff then passively dropped to the ground to prevent defendants

17   Pierce and Lopez and Sgt. Valice from closing the cell door.  Pierce Decl. ¶ 14.  Plaintiff denies

18   that he passively dropped to the ground to prevent closing the cell door.  Compl. ¶¶ 8-9.  Rather,

19   plaintiff maintains that because his back went out during the initial use of force, he was unable to

20   stand.  Pl. Dep. at 31:6-12.

21        7.   After the second incident, defendants Pierce and Lopez declare that plaintiff was taken

22   for a medical evaluation because plaintiff could not be placed in a holding cell.  Pierce Decl.

23   ¶¶ 15, 16; Lopez Decl. ¶ 11.  Plaintiff declares he was taken to medical due to an injury.  Pl. Decl.

24   ¶ 5.

25        8.   Defendants argue that the video of the third incident reflects plaintiff actively resisting

26   correctional staff's efforts to place him in a holding cell by pushing off the back wall and then

27   passively falling to the ground so the door could not be closed behind him.  Defs. Mem. at 3:28-

28   4:3.  Plaintiff declares that once he was handcuffed and his feet restrained with leg irons, at no

1   time did he kick off or resist.  Pl. Decl. ¶ 4.

2       9.  Following the third incident, defendant Pierce declares that plaintiff "still required a

3   mental health evaluation because of his statements concerning his suicidal intent."  Pierce Decl.

4   ¶ 19.  Because defendants could not put plaintiff in the holding cell due to plaintiff's resistance,

5   defendant Pierce and nonparty Ortega put plaintiff in the stokes litter and lifted him onto a

6   gurney.  Id.  Defendant Pierce "instructed staff to escort plaintiff on the rolling gurney to the B

7   facility contraband area and apply soft restraints to protect plaintiff from himself."  Id.  Pierce

8   declares that this concluded his involvement.  Id. ¶ 20.

9       Plaintiff claims that after he was put on the gurney, an unknown correctional sergeant

10  arrived, and plaintiff told the nonparty sergeant that plaintiff wanted to make a staff complaint of

11  excessive force.  Compl. ¶ 13.  Plaintiff alleges that defendant Pierce responded, "you wanna

12  [write] me up . . I['']m gonna beat you to the punch and write you up for resisting and battery and

13  send your monkey ass to the hole."  Id.  When plaintiff reminded defendant Pierce that there are

14  video cameras, plaintiff alleges Pierce responded, "o' I know how to set you up cause I know

15  where all the blind spots are."  Id.  Plaintiff states that defendant Pierce "then ordered several

16  unidentified officers to wheel plaintiff out of the view of other inmates, taking plaintiff to an

17  isolation room where defendant Pierce ordered the unidentified officers to "turn him on his belly,

18  grab some sheets and tie his ass in a stress position."  Id. at ¶ 14.  Once plaintiff was on his

19  stomach, plaintiff alleges that defendant Pierce began pummeling the back of plaintiff's head with

20  Pierce's clenched fists while his orders to tie plaintiff in a stress position were carried out.  Id. at

21  ¶ 15.  Once the unidentified officer completed tying plaintiff up, plaintiff alleges that defendant

22  Pierce "inspected the sheets," and said, "no[,] tie it tighter around his ribs."  Id.   Plaintiff alleges

23  that defendant Pierce and the unidentified officer tightened the sheets around plaintiff's rib and

24  upper torso.  Id.

25      10.  Plaintiff contends that defendant Pierce ordered medical staff not to place plaintiff on

26  suicide watch.  Compl. ¶ 18.  Defendant Pierce declares that he did not instruct anyone to put

27  plaintiff in administrative segregation, and as a sergeant, did not have the authority to send

28  inmates to administrative segregation.  Pierce Decl. ¶¶ 21, 23.

11.  Defendants point out that the medical evaluation form marked 2:35 p.m. noted plaintiff had pain in both wrists, his neck, and back, but documents no visible injuries.  Goldstein Decl., Ex. 6.  Plaintiff denies that the medical staff inspected plaintiff's body because plaintiff was wrapped in sheets from his ankles to his neck, making it impossible for medical staff to examine whether plaintiff had injuries.  Pl. Decl. ¶ 8.

12.  The fourth medical record completed after plaintiff's attempted suicide reflects the following:  (a) plaintiff reported pain 10/10 in back of neck, no shortness of breath, no pain on swallowing; (b) on physical exam, medical staff noted that plaintiff was walking comfortably and sitting on exam table comfortably; (c) plaintiff was prescribed Tylenol and returned to his cell. Goldstein Decl., Ex. 7.  Plaintiff admitted that this is what the medical record indicated but did not admit the truth of any of the assertions made therein.  Pl. Opp'n at 3 (ECF No. 65 at 11 ¶ 17).

13.  The last medical record reflected the following:  (a) plaintiff reported that he was "assaulted by five officers and was tied to a gurney," and (b) medical staff noted plaintiff had scratches to both knees, pain in his left wrist and left heel, and a scratch on his right elbow. Goldstein Decl., Ex. 8.  Plaintiff admitted that this is what the medical record indicated but did not admit the truth of any of the assertions made therein.  Pl. Opp'n at 4 (ECF No. 65 at 11  ¶ 18).

14.  Defendants Pierce and Lebeck declare that on February 21, 2020, they were not aware of plaintiff having complained to the Ombudsman about officer misconduct.  Pierce Decl. ¶ 22; Lebeck Decl. ¶ 7.  Plaintiff disputes their statements, declaring that after Pierce and Lebeck pinned plaintiff to the ground, Lebeck stated, "you want to cry to the Ombudsman, we'll give you something to cry about."  Compl. ¶ 6.  Plaintiff understood this comment to refer to plaintiff's prior interview with Ombudsman Bolden regarding officer misconduct in the mental health program.  Compl. ¶ 7.

15.  Defendants contend plaintiff displayed no serious, visible injuries during the use of force interview video.  Andrade Decl. ¶ 3, Ex. 1.  While plaintiff complained of injuries to virtually his entire body from the alleged uses of force, during the use of force interview video defendants point out that plaintiff referred to the tightness of his handcuffs that he was then wearing as his "main injury."  Id.

Plaintiff denies he did not suffer serious injury.  In the use of force interview video, plaintiff complained of extreme back pain, abrasions to his wrists, knees and arm, and an injury to the left top side of his head, and noted his jaw felt like he might have a loose tooth.  Use of Force Video at 1:52-4:37.  Plaintiff cried out in pain when the officers helped him stand up to show his injuries and groaned in pain at several other points.  Id. (see, e.g., 2:41, 2:58, 3:02).  Following the initial use of force, plaintiff declares he was unable to stand due to injuries to his back, groin, and legs sustained from the initial use of force.  Compl. ¶ 8.  In addition, plaintiff states he was left in a stress position with his hands handcuffed behind his back and leg shackled, face down on a gurney tied down with sheets wrapped around his body from upper neck to his feet, that was so tight it labored his breathing and caused his body joints to burn with extreme pain.  Compl. ¶ 16.  In his deposition, plaintiff testified that he had severe joint pain the next day and was unable to walk.  Pl. Dep. 46:18-22, 46:6-11.  Following his transfer to High Desert State Prison, plaintiff testified that he received additional pain medication and physical therapy.  Pl. Dep. 49:4-11.

      E.     <u>Eighth Amendment Deliberate Indifference to Serious Mental Health Needs Claim Against Defendant</u>

In his second claim, plaintiff contends that defendant Pierce was deliberately indifferent to plaintiff's serious mental health needs by failing to address plaintiff's attempted suicide, including telling the unidentified mental health clinician not to send plaintiff to a crisis bed but clear him for the hole, and locking and leaving him restrained in the stress position for about six hours, all in violation of the Eighth Amendment.  Compl. ¶¶ 17-22.  Defendants move for summary judgment on the deliberate indifference claim based on plaintiff's failure to exhaust this claim.

      *1.*     *Standards Governing Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  There is no "special

circumstances" exception to the PLRA's rule of exhaustion prior to filing "any action." Ross v. Blake, 578 U.S. 632, 638-39 (2016) (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006); Jones v. Bock, 549 U.S. 199, 211 (2007)).

However, the PLRA provides one textual exception by using the term "available," meaning "'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" Ross, 578 U.S. at 642 (quoting Booth v. Churner, 532 U.S. 731, 737-38 (2001)). The Supreme Court found "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." Ross, 578 U.S. at 643-44. Such circumstances are:

> (1) when the administrative procedure "operates as a simple dead end" because officers are "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) when prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

Andres v. Marshall, 867 F.3d 1076, 1078 (9th Cir. 2017) (quoting Ross, 578 U.S. at 643-44). The Ninth Circuit characterized the list in Ross as "non-exhaustive," stating that "the PLRA does not require exhaustion when circumstances render administrative remedies effectively unavailable." Andres, 867 F.3d at 1078 (internal quotations and citation omitted). "When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." Id.

In addition, for exhaustion to be "proper," a prisoner must comply with the prison's procedural rules, including deadlines, as a precondition to bringing suit in federal court. Woodford, 548 U.S. at 90 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules."). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones, 549 U.S. at 218.

"Nonexhaustion" is an affirmative defense and defendants have the burden of "prov[ing] that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino v. Baca, 747 F.3d 1162, 1171-72 (9th Cir. 2014). A remedy is

17

1  "available" where it is "capable of use; at hand." Williams v. Paramo, 775 F.3d 1182, 1191 (9th

2  Cir. 2015) (quoting Albino, 747 F.3d at 1171).  Grievance procedures that do not allow for all

3  types of relief sought are still "available" as long as the procedures may afford "some relief."

4  Booth, 532 U.S. at 738.  If a defendant meets the initial burden, a plaintiff then must "come

5  forward with evidence showing that there is something in his particular case that made the

6  existing and generally available administrative remedies effectively unavailable to him." Albino,

7  747 F.3d 1172.  Remedies are "effectively unavailable" where they are "ineffective,

8  unobtainable, unduly prolonged, inadequate, or obviously futile." Id. (quoting Hilao v. Estate of

9  Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996)).  "[T]he ultimate burden of proof" remains with

10  the defendants. Albino, 747 F.3d at 1172-73.  Only "[i]f the undisputed evidence viewed in the

11  light most favorable to the prisoner shows a failure to exhaust, [is] a defendant entitled to

12  summary judgment under Rule 56." Albino, 747 F.3d at 1166.

13  　　　　　　　　*2.　　California's Inmate Appeal Process*[11]

14  　　　　　The State of California provides its inmates and parolees the right to administratively

15  appeal "any policy, decision, action, condition, or omission by the department or its staff that the

16  inmate or parolee can demonstrate as having a material adverse effect upon his or her health,

17  safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).  California prisoners are required to

18  lodge their administrative complaint on a CDCR-602 form, which instructs the inmate to explain

19  the issue and set forth the action requested.

20  　　　　　In February of 2020, there were three formal levels of appeal review.  All appeals were

21  required to be initially filed and screened at the first level unless the first level was otherwise

22  waived.  The appeals coordinator was permitted to bypass the first level for various reasons

23  outlined under Section 3084.7.

24  

---

25  [11]  In 2020, California changed the grievance system from a three-level system to a two-level
system.  That change was effective June 1, 2020, after plaintiff submitted relevant appeals in the
26  instant case. See Cal. Code Regs. tit. 15, § 3480.  Therefore, the prior law applies and all
citations to the California code in the text herein refer to the prior law, which can be found here:
27  https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2020/04/Master-File-Appeals-
Emerg-Regs_ADA.pdf.  California Code of Regulations, title 15, sections 3084 through 3084.9
28  were repealed, and replaced and renumbered with amended sections 3480 through 3487.

In February of 2020, an inmate had 30 calendar days to submit an appeal from the date of event or decision being appealed, upon first having knowledge of the action or decision being appealed, or upon receiving an unsatisfactory departmental response to an appeal filed.  Cal. Code Regs. tit. 15, § 3084.8(b)(1)-(3).  The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures.  Jones, 549 U.S. at 218; see also Sapp, 623 F.3d at 824 ("To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations").  In California, the prisoner was required to describe the adverse action or decision being appealed and the relief requested, list all staff member(s) involved and [] describe their involvement in the issue" and if unknown, "provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question." and to state all facts known and available to [the prisoner] regarding the issue being appealed.  CCR tit. 15, § 3084.2(a)(3-4).

Administrative procedures generally are exhausted once a plaintiff has received a "Director's Level Decision," or third level review, with respect to the issues or claims.  Id. § 3084.1(b).  Responses at the third level of review were to "be completed within 60 working days from the date of receipt by the third level Appeals Chief," excluding certain exceptions not applicable here.  Id., § 3084.8(c)(3).

3. <u>Discussion</u>

Defendants contend that plaintiff did not exhaust his claim that defendant Pierce was deliberately indifferent to plaintiff's serious medical needs because Pierce failed to address plaintiff's attempted suicide.  Defs. Mem. at 14:19-15:5.  Plaintiff argues that on April 17, 2020, he informed the interviewer that defendant Pierce instructed medical staff not to place plaintiff on suicide watch but to clear plaintiff for administrative segregation, thus making prison officials aware of defendant Pierce's indifference to plaintiff's serious medical needs.  Pl. Decl. ¶ 10. Therefore, plaintiff contends he substantially complied with the exhaustion requirement.  Pl. Opp'n at 4.  In reply, defendants counter that even if plaintiff made such statement in the grievance interview, raising a new claim in a grievance interview is insufficient to exhaust the deliberate indifference claim because prison regulations require all issues to be alleged in the

19

1  original grievance.  Defs. Reply at 4 (citing Cal. Code Regs. tit. 15, § 3084.1(b)).

2       Plaintiff agrees that exhaustion is dictated by the prison's administrative grievance policy

3  and does not dispute that administrative remedies were available to him.  Pl. Opp'n at 4.  It is

4  undisputed that plaintiff's Grievance 720 did not include his allegation that defendant Pierce was

5  indifferent to plaintiff's attempted suicide.  Rather, plaintiff grieved the use of excessive force.

6  Moseley Decl., Ex. 3.  Plaintiff included a statement that while he was in administrative

7  segregation, he attempted suicide and when they came to cut plaintiff down, nonparty Officer

8  Garcia punched plaintiff's head.  Id.  However, such allegation does not implicate defendant

9  Pierce or put prison officials on notice that plaintiff alleged that Pierce was deliberately

10  indifferent to plaintiff's suicide attempt.  Prison regulations at the time required that all issues be

11  identified in the initial grievance.  Cal. Code Regs. tit. 15, § 3084.2(a)(3-4).  Raising new issues

12  during the grievance interview process does not comport with such regulations.  See Jackson v.

13  Villasenor, 2023 WL 6390597, at *6 (N.D. Cal. Sept. 29, 2023) ("Mr. Jackson thus was required

14  to identify his retaliation claim in his original grievance, not to raise it in a conversation during

15  the investigation of that grievance.")  As discussed above, in order to exhaust administrative

16  remedies, plaintiff is required to comply with prison regulations governing the exhaustion of

17  administrative remedies.  Jones, 549 U.S. at 218; see also Sapp, 623 F.3d at 824.

18       Plaintiff's Grievance 720 did not allege that prison staff failed to appropriately address

19  plaintiff's attempted suicide or his claims that he was suicidal, including that defendant Pierce

20  sent plaintiff to administrative segregation rather than a crisis bed.  Even if plaintiff later

21  informed the grievance interviewer that defendant Pierce was deliberately indifferent to plaintiff's

22  suicide attempt, such information does not exhaust plaintiff's administrative remedies as to such

23  claim because the allegation was not included in plaintiff's initial grievance.  Plaintiff's reliance

24  on a substantial compliance argument fails because after the PLRA was implemented, substantial

25  compliance is not sufficient to demonstrate exhaustion.  See Ross, 578 U.S. at 642.

26       Under certain circumstances, the Ninth Circuit has found that prison officials cured a

27  prisoner's failure to exhaust by their later actions in addressing issues not included in the original

28  grievance.  See, e.g., Reyes v. Smith, 810 F.3d 654, 658, 659 (9th Cir. 2016) ("when prison

1    officials address the merits of a prisoner's grievance instead of enforcing a procedural bar, the

2    state's interests in administrative exhaustion have been served.")  But here, prison officials only

3    addressed plaintiff's excessive force and sexual misconduct claims.  Moseley Decl., Ex. 3.

4    Plaintiff's failure to exhaust was not cured.

5           In Grievance 720, plaintiff failed to include any factual allegations supporting his claims

6    that defendant Pierce was deliberately indifferent to plaintiff's serious medical or mental health

7    needs.  Because plaintiff failed to exhaust such claims, defendant Pierce is entitled to summary

8    judgment on the Eighth Amendment deliberate indifference to plaintiff's serious mental health

9    needs claim.

10          F.      Eighth Amendment Excessive Force Claims

11          The complaint alleges the following excessive force claims:  (1) first incident (initial

12   encounter) against defendants Pierce, Lebeck, and Lopez; (2) second incident (initial placement

13   in standing only cell) against defendants Pierce and Lebeck; (3) third incident (second placement

14   in standing only cell with video) against defendant Pierce; and (4) fourth incident (placement in

15   stress position) against defendant Pierce.  Defendants move for summary judgment on all

16   excessive force claims.  Before examining each excessive force claim, the Court first addresses

17   excessive force standards, defendants' arguments regarding plaintiff's purported lack of

18   significant injury, and defendants' arguments regarding inconsistencies between plaintiff's

19   allegations and the record.

20                 1.      *Eighth Amendment Standards Governing Excessive Force*

21          "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places

22   restraints on prison officials, who may not . . . use excessive physical force against prisoners."

23   Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "[W]henever prison officials stand accused of

24   using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is

25   . . . whether force was applied in a good-faith effort to maintain or restore discipline, or

26   maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  The

27   malicious and sadistic use of force to cause harm always violates contemporary standards of

28   decency, regardless of whether or not significant injury is evident.  Id. at 9; see also Oliver v.

1     <u>Keller</u>, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines

2     de minimis uses of force, not de minimis injuries).  However, not "every malevolent touch by a

3     prison guard gives rise to a federal cause of action."  <u>Hudson</u>, 503 U.S. at 9.  "The Eighth

4     Amendment's prohibition of cruel and unusual punishments necessarily excludes from

5     constitutional recognition de minimis uses of physical force, provided that the use of force is not

6     of a sort 'repugnant to the conscience of mankind.'"  <u>Id.</u> at 9-10 (internal quotations marks and

7     citations omitted).

8         When determining whether the force was excessive, the court looks to the "extent of

9     injury suffered by an inmate . . ., the need for application of force, the relationship between that

10     need and the amount of force used, the threat 'reasonably perceived by the responsible officials,'

11     and 'any efforts made to temper the severity of a forceful response.'"  <u>Id.</u> at 7 (quoting <u>Whitley v.</u>

12     <u>Albers</u>, 475 U.S. 312, 321 (1986)).

13                *2.*     *Purported Lack of Significant Injuries*

14         Defendants argue that plaintiff's lack of significant injuries is obvious in the use of force

15     interview video, where plaintiff complained of injuries to "virtually his entire body but referred to

16     the tightness of his handcuffs . . . as his 'main injury.'"  Defs. Mem. at 6:2-4.  Essentially,

17     defendants argue that the lack of documented significant injuries confirms that the force used was

18     not excessive.  Plaintiff disputes defendants' argument that plaintiff sustained no significant

19     injuries.

20         The Supreme Court has rejected defendants' argument that a lack of significant injury

21     confirms that the force used was not excessive:

22             [In <u>Hudson v. McMillian</u>, <u>supra</u>, 503 U.S. 1], this Court rejected the
            notion that "significant injury" is a threshold requirement for stating

23             an excessive force claim. The "core judicial inquiry," we held, was
            not whether a certain quantum of injury was sustained, but rather

24             "whether force was applied in a good-faith effort to maintain or
            restore discipline, or maliciously and sadistically to cause harm." 503

25             U.S. at 7; <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319-321 (1986).
            "When prison officials maliciously and sadistically use force to cause

26             harm," the Court recognized, "contemporary standards of decency
            always are violated . . . whether or not significant injury is evident.

27             Otherwise, the Eighth Amendment would permit any physical
            punishment, no matter how diabolic or inhuman, inflicting less than

28             some arbitrary quantity of injury." <u>Hudson</u>, 503 U.S. at 9; <u>see also</u>

22

1

2

3

> id. at 13-14 (Blackmun, J., concurring in judgment) ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks").

4

5

6

7

8

9

10

11

12

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. Id. at 7. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid. (quoting Whitley, 475 U.S. at 321). The extent of injury may also provide some indication of the amount of force applied. As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Ibid. (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Ibid. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

13

14

15

16

17

> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury. Accordingly, the Court concluded in Hudson that the supposedly "minor" nature of the injuries "provide[d] no basis for dismissal of [Hudson's] § 1983 claim" because "the blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not de minimis for Eighth Amendment purposes." 503 U.S. at 10.

18    Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010). "Defendant[s'] evidence—that defendant[s']

19    medical expert finds no injury in plaintiff's medical records attributable to defendant[s'] conduct

20    and the absence of visible injuries on the use of force videotape—simply raises a dispute of

21    material fact regarding the existence and extent of plaintiff's injury." Jenkins v. Bonds, 2017 WL

22    3839964, at *5 (E.D. Cal. Sept. 1, 2017) ("Overly-tight handcuffs need not produce a visible

23    physical injury to support a claim of excessive force; it is enough that the cuffs caused plaintiff

24    unnecessary pain, which plaintiff avers that they did.") (citing Thompson v. Lake, 607 F. App'x

25    624, 625 (9th Cir. 2015).

26         Therefore, defendants are not entitled to summary judgment on the grounds that plaintiff

27    did not suffer significant injury. Moreover, as set forth above, the nature and extent of plaintiff's

28    injuries is disputed. DF 13.

23

1    In their reply, defendants argue that plaintiff's self-serving declaration in opposition to the

2    motion only states "I sustained injury [sic] which required medical attention."  Defs. Reply at 2

3    (citing Pl. Opp'n at 1 (ECF No. 65 at 7)).  Defendants cite <u>Soremekun v. Thrifty Payless, Inc.</u>,

4    509 F.3d 978, 984 (9th Cir. 2007), for the proposition that "[c]onclusory, speculative testimony in

5    affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

6    judgment.  <u>Id.</u>  The Court finds that plaintiff's allegations regarding his injuries do not render his

7    claims of excessive force unbelievable, particularly in light of his pre-existing chronic pain

8    conditions.  <u>See</u> Compl. ¶¶ 8-11.  A verified complaint may be used as an opposing affidavit or

9    declaration under Rule 56, as long as it is based on personal knowledge and sets forth specific

10   facts admissible in evidence.  <u>See</u> <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 & n.10-11 (9th Cir.

11   1995) (treating plaintiff's verified complaint as opposing affidavit where plaintiff stated under

12   penalty of perjury that contents were true and correct, and allegations were not based purely on

13   his belief but on his personal knowledge).  Indeed, in his deposition, plaintiff testified that his

14   prior injuries to his back, neck and shoulder were exacerbated by the alleged excessive uses of

15   force.  Pl. Dep. 46:20-22.  The trier of fact should consider the credibility of plaintiff's claims

16   regarding his injuries.  <u>Manley v. Rowley</u>, 847 F.3d 705, 711 (9th Cir. 2017) (court may not make

17   credibility determinations on summary judgment).

18       For the reasons discussed above, the Court recommends that defendants' motion for

19   summary judgment on the grounds that plaintiff did not suffer significant injury motion be

20   denied.

21           *3.    Purported Inconsistencies and Contradictions*

22       Defendants argue that plaintiff's allegations should fail because various inconsistencies

23   with plaintiff's allegations and contradictions in the factual record "undermine the credibility of

24   plaintiff's claims."  Defs. Mem. at 7:25.  Based on such inconsistencies and contradictions,

25   defendants contend "that no reasonable jury could believe them [and, in turn, this Court] need not

26   rely on those facts for purposes of ruling on the summary judgment motion."  <u>Id.</u> at 7:25-28

27   (quoting <u>Wilkinson v. Torres</u>, 610 F.3d 546, 550 (9th Cir. 2010)).  Defendants claim plaintiff was

28   agitated, suicidal and homicidal when they first encountered plaintiff, which they argue belies

plaintiff's claim that defendants acted "without warning or provocation."  Defs. Mem. at 8:7-8 (citing Pl. Compl. ¶ 2).  Also, in the complaint, plaintiff alleges defendant Lebeck grabbed and twisted plaintiff's scrotum, but in Grievance 720, plaintiff alleged it was defendant Pierce.  Compare Pl. Compl. ¶ 5, with UDF 17.  Further, defendants maintain that the video of the third incident speaks for itself and reflects no use of excessive force.  Defs. Mem. at 8:11-12.  Defendants claim plaintiff's allegation that he was tied in a stress position for approximately six hours (Pl. Compl. ¶ 16) is inconsistent with his prior statements.  For example, in Grievance 720, plaintiff claimed he was restrained for four hours.  UDF 17.  Defendants argue that the second holding cell incident ended around 1:35 p.m. and plaintiff received a medical evaluation at 2:35 p.m., so plaintiff could not have been restrained for more than about an hour.  Defs. Mem. at 8:21 (see also UDF 10).

Further, defendants argue that based on plaintiff's statements about being suicidal and homicidal, and his refusal to enter the holding cell, restraining plaintiff was the only option to protect plaintiff from himself and others while he waited for a medical evaluation.  Defs. Mem. at 8:22-9:2 (citing Sheppard v. Razo, 2008 WL 902202, at *4 (N.D. Cal. Mar. 31, 2008)).[12]  Finally, defendants argue that plaintiff's medical records and the use of force interview taken only hours after the alleged excessive force reflect no serious, visible injuries to plaintiff and "undermine the plausibility of plaintiff's claims that he suffered a brutally violent, daylong excessive force violation."  Defs. Mem. at 9:3-27; see also id. at 5:10-26, 6:5-7.

In his opposition, plaintiff does not separately address each argument set forth above but rather addresses the causes of action set forth in his complaint.  See Pl. Opp'n, passim.  However, plaintiff declares he "sustained injury [sic] which required medical attention."  Id. at 1 (ECF No. 65 at 7).

---

[12]  In Sheppard, the Court found that restraining suicidal inmates for five hours did not violate the Eighth Amendment because "defendant was attempting to address plaintiff's immediate needs and was not acting with criminal recklessness or ignoring an excessive risk to plaintiff's health or safety.  Rather, fearing that plaintiff might harm himself, defendant restrained plaintiff so that defendant could summon medical staff to attend to a possibly dangerous situation."  Sheppard, 2008 WL 902202 at *4.

As defendants are aware, the Court is not permitted to make credibility evaluations on summary judgment.  See Manley, 847 F.3d at 711.  There are disputes of material fact, as set forth in detail above and analyzed below, that preclude finding that all of plaintiff's claims in this action are implausible despite the noted inconsistencies and contradictions.  For example, plaintiff denies he ever claimed being homicidal.  Also, although plaintiff did not explain why he changed the name of the officer who allegedly grabbed plaintiff's scrotum during the first incident, given that plaintiff was lying face down on the ground at the time, it is plausible he could not correctly identify the responsible officer when he submitted Grievance 720.

In addition, there are disputes of material fact regarding the amount of force defendants used in trying to place plaintiff into the standing room only holding cell, whether plaintiff was resisting placement into this holding cell by kicking the wall, and whether plaintiff was able to stand.  Despite defendants' argument to the contrary, the video of the third incident does not establish that excessive force was not used because the video does not show the full encounter where the standing only holding cell is only partially visible.  As a result, the video does not fully show the actions or movement of defendants or plaintiff in the holding cell.  For example, the video does not show whether plaintiff was kicking off the back wall while being placed into the holding cell as defendants allege.  The video shows defendants pushing and shoving plaintiff to get him into the standing room only holding cell.  The video also appears to show defendants kicking plaintiff because there is movement near the ground, but it's not clear if defendants are actually kicking plaintiff.

Finally, while the Court is concerned about plaintiff's mischaracterization of the length of time he was allegedly held in the stress position (fourth incident), this is not relevant because there is no evidence demonstrating any of the defendants were responsible for how long plaintiff was restrained in the stress position.

At trial, defendants may attack plaintiff's credibility, point out inconsistencies in his testimony and question the weight of the evidence, but it is improper to consider such challenges at summary judgment.[13]  The Court therefore rejects defendants' argument regarding the

_____

[13] "The Ninth Circuit has cautioned against granting summary judgment on excessive-force

1   inconsistencies and contradictions that affect plaintiff's credibility, and turns now to evaluate

2   each use of force incident.

3

4             *4.      First Incident Against Defendants Pierce, Lebeck, and Lopez:  Initial Encounter*

5         In their motion, defendants argue that when plaintiff was first encountered, he was

6   agitated, to the point of being suicidal and homicidal, and contend this belies "any notion that

7   plaintiff was compliant with defendants' efforts to restrain him," and plaintiff's claim that

8   defendants "acted without warning or provocation."  Defs. Mem. at 8 (citing Compl. ¶ 2).

9   Plaintiff admits he was feeling suicidal and suffering PTSD after he was informed that he was

10  assigned a cellmate with whom he did not get along.  UDF 3.  After plaintiff claimed he was

11  suicidal, defendants declare they attempted to restrain plaintiff to take him for a mental health

12  evaluation, but he refused, and plaintiff resisted efforts to restrain him.

13        On the other hand, plaintiff maintains that he told defendants that he was suicidal and

14  needed to see a mental health clinician but did not resist efforts to handcuff or apply leg restraints.

15  Pl. Decl. ¶ 4.  And in his deposition, plaintiff testified he was given no orders to submit to

16  restraints or to return to his cell.  Pl. Dep. at 23:4-6.  Further, before the restraints were applied,

17  plaintiff also declares that defendant Pierce repeatedly punched plaintiff in the back of his head

18  and upper torso, defendant Lebeck grabbed plaintiff by his scrotum, repeatedly yanking and

19  twisting on them with violent force, and when defendant Lopez appeared, Lopez repeatedly

20  kicked plaintiff in his legs.  Compl. ¶ 5.  After the restraints were applied, plaintiff claims he was

21  unable to stand due to injuries to his back, groin, and legs, and was placed on a gurney and taken

22  to the Facility B program office.  Id. ¶ 8.

23        Because the Court is presented with disputes of material fact as to what happened during

24  the first incident, the Court finds that summary judgment is inappropriate.  A dispute of material

25  _____

26  claims because the essential 'balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom.'"  Reed v. Dzurenda, 2021 WL 3864477, at *6 (D. Nev. Aug. 27, 2021) (quoting Drummond ex rel. Drummond v. City of Anaheim, 343

27  F.3d 1052, 1056 (9th Cir. 2003); Liston v. Cnty. of Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997), as amended (Oct. 9, 1997)).

28

fact exists as to whether plaintiff claimed he was homicidal, whether plaintiff was ordered to return to his cell or submit to restraints, and whether the amount of force used on plaintiff was reasonable under the circumstances.  A reasonable juror could find that the initial use of force was not justified.  Conversely, a reasonable juror could also find that the initial use of force was justified if the jury found plaintiff did not comply with orders to return to his cell or resisted defendants' efforts to restrain him to take him for a mental health examination as the record reflects that plaintiff was issued a rules violation report ("RVR") for willfully resisting.[14]  (ECF No. 21-4, Ex. B at 24.)  The factual disputes set forth above require a trier of fact to make credibility determinations, which preclude a dispositive finding at the summary judgment stage on plaintiff's excessive force claim based on the first incident.  The Court therefore finds that defendants Pierce, Lebeck and Lopez are not entitled to summary judgment as to the first incident.

> 5.   *Second Incident Against Defendants Lebeck and Pierce:  Initial Placement in Standing Only Holding Cell*

Plaintiff raises an excessive force claim against defendants Lebeck and Pierce based on the second incident when defendants initially tried to place plaintiff in the standing room only holding cell.

/ / /

---

[14]  The RVR also noted that the hearing officer reviewed the available mental health evidence in which the assessing clinician noted plaintiff's mental disorder contributed to the behavior leading to the RVR writing that plaintiff "is being treated for a mental illness that leads to irritability, which had a direct effect on the behavior which led to the RVR."  (ECF No. 21-4, Ex. B at 24)  Based on such information, the hearing officer noted that plaintiff's "mental illness appeared to contribute to his behavior at the time of the offense and [would] be taken into consideration."  Id.

Prison officials may use reasonable force when inmates disobey orders.  White v. Roper, 901 F.2d 1501, 1507 (9th Cir. 1990) (defendants entitled to use reasonable force when inmate disobeyed order to enter cell occupied by another inmate); Uerling v. Piccinini, 238 F.3d 433, 433 (9th Cir. 2000) (unpublished) (because the plaintiff admitted that he refused to comply with orders to be handcuffed and removed from his cell, and physically resisted correctional officers attempting to remove him from his cell, the force used to extract and restrain him was not unreasonable); Turner v. Graff, 2012 WL 3656492, at *4 (N.D. Cal. Aug. 17, 2012) ("Even if plaintiff's resistance did not pose a physical threat to the officers, it created a need for them to apply reasonable force to control plaintiff in order to maintain discipline and order.").

a.      Defendant Lebeck

In the complaint, plaintiff states that "because plaintiff was unable to stand in the standing room only holding cell, defendant Lebeck was unable to close its door."  Compl. ¶ 9.  Plaintiff includes no other allegations as to defendant Lebeck in connection with the second incident.  In his declaration, defendant Lebeck declares that his involvement ended once plaintiff was transported to medical after the first incident.  Lebeck Decl. ¶ 6.  In plaintiff's responses to defendants' statement of undisputed facts, plaintiff denies Lebeck was not involved, citing paragraph 9 of his complaint.  Pl. Opp'n. at 2 ¶ 7 (ECF No. 65 at 10).  But plaintiff provides no additional allegations or evidence in connection with his claim as to defendant Lebeck's involvement in incident two.  Id., passim.  Regardless, plaintiff's allegation that defendant Lebeck could not close the holding cell door, standing alone, is insufficient to state a cognizable excessive force claim.  Defendant Lebeck is entitled to summary judgment as to the excessive force claim for the second incident.

b.      Defendant Pierce

The Court finds there are disputes of material fact as to whether defendant Pierce used excessive force during the second incident.  Defendant Lopez declares that plaintiff "continued resisting by refusing to stand and be placed in holding cell number 9."  Lopez Decl. ¶ 10.  Defendant Pierce declares that because plaintiff was "refusing to walk," plaintiff was placed on a stokes litter and put on a rolling gurney and transported to the holding cell, where defendant Pierce, nonparty Officer Valice and defendant Lopez assisted plaintiff out of the stokes litter and onto his feet.  Pierce Decl. ¶ 11.  Both defendants Lopez and Pierce declare that plaintiff "kicked off the back of the holding cell, propelling himself backwards."  Lopez Decl. ¶ 10; Pierce Decl. ¶ 13.  Defendant Lopez declared that plaintiff's actions pushed nonparty Valice and Lopez out of the holding cell.  Lopez Decl. ¶ 10.

On the other hand, plaintiff claims that he told defendant Pierce that plaintiff was "in extreme pain and needed medical attention because he could not stand."  Compl. ¶ 8.  Plaintiff contends defendant Pierce ignored plaintiff's request for medical care, responding "get in the cage or I[']m gonna put you in head first."  Id.  Further, in his deposition, plaintiff testified that he

1    told officers he could not stand while they were trying to put him in the holding cell—a cell with

2    no room to sit.  Pl. Dep. 31:6-12.  Plaintiff testified that he told them "I can't stand.  I can't

3    stand."  Pl. Dep. 31:21-32:2.  Plaintiff declares that "at no time did [he] kick off or resist being

4    placed in any holding cell."  Pl. Decl. ¶ 4.  Plaintiff contends defendant Pierce "forcefully

5    slammed [plaintiff] into the holding cage."  Compl. ¶ 8.

6         The Court finds that such disputes of material fact preclude entry of summary judgment

7    on behalf of defendant Pierce as to the second incident.  On this record, a dispute of material fact

8    exists as to whether the amount of force used on plaintiff was reasonable in light of the

9    circumstances.  The factual disputes set forth above require a trier of fact to make credibility

10   determinations, which preclude granting summary judgment to defendant Pierce on plaintiff's

11   excessive force claim as to the second incident.

12            6.    *Third Incident Against Defendant Pierce:  Placement in Standing Only*
                   *Holding Cell*
13

14        Plaintiff claims defendant Pierce used excessive force in the third incident when Pierce

15   and other correctional staff again attempted to place plaintiff into the standing room only holding

16   cell at approximately 1:32 p.m.  The Court finds that there are disputes of material fact that

17   preclude granting summary judgment on this claim.

18        Despite defendants' argument that the video of the third incident "speaks for itself," as

19   discussed above, the video does not show the full encounter.  The closer camera view (B Yard

20   Breezeway 1012) is from behind the holding cell, and it is not possible to see whether plaintiff is

21   kicking off from the back of the cell as defendants contend and plaintiff disputes.  From this

22   angle, it does not appear that plaintiff was resisting but the video does not show the entire holding

23   cell.  Indeed, initially in the video plaintiff was simply laying in the gurney with his hands

24   handcuffed in front of him, and his legs shackled together.  Further, as noted above, plaintiff

25   denies he kicked off or resisted being put in a holding cell at any time.  Pl. Decl. ¶ 4.

26        On the other hand, the B Yard Breezeway 1012 video does not show a correctional officer

27   "repeatedly slamming" plaintiff against the back of the holding cell as plaintiff alleges.  B Yard

28

Breezeway 1012 video at 1:02-1:32.  It appears that correctional staff were pushing, shoving, and possibly kicking or using their feet in their efforts to put plaintiff into the standing room only holding cell.  Id.  At one point, plaintiff falls to the ground and his legs are shown outside the holding cell, but he is not fully visible in the video.  The Court is unable to determine from the video what caused plaintiff to fall to the ground, whether plaintiff could not stand or walk as he claims, or whether plaintiff was resisting or uncooperative as defendants claim.  At one point in the video, plaintiff does appear to be "dead weight" as he described himself in his deposition.  Pl. Dep. at 32:12.

The B Yard Breezeway 1013 video also does not provide a clear view of whether plaintiff was kicking off the back wall when he was being placed into the holding cell.  However, the video appears to show plaintiff putting his foot around the cell door.  B Yard Breezeway 1013 video at 1:02-11:15.  Defendants contend such movement was plaintiff's attempt to keep the cell door open, demonstrating his resistance.  But the video is unclear, and it does not resolve whether or not plaintiff was kicking off the back wall, or whether the use of force was necessary in the first place.

Importantly, before this third incident, defendants had already unsuccessfully attempted to put plaintiff in a standing room only holding cell (the second incident).  Plaintiff was brought to the second standing room only holding cell on a gurney, not in any apparent distress or being resistive.  It is unclear why, after the first attempt to put plaintiff into the holding cell failed, defendants would again attempt to put plaintiff into a holding cell rather than keeping plaintiff restrained on a gurney.  Indeed, once the correctional officers fail a second time at their efforts to place plaintiff into the holding cell, they resort to placing him to the gurney and taking him to another room.

Overall, the Court finds that there are disputes of material fact as to the need for the use of force, whether there was a reasonable threat, what force was used by defendant Pierce and other correctional staff, whether plaintiff was able to stand, what statements were made by plaintiff and defendants, and whether plaintiff was resisting and kicking off the back wall.  While the Court acknowledges that prisoners are required to comply with orders, including orders to get into a

31

holding cell, it is unclear whether the use of force is necessary where the prisoner informs the correctional officers that the prisoner is unable to stand, and the holding cell has no place for the prisoner to sit.  The Court finds that disputes of material fact require that the jury must decide whether defendants' efforts to put plaintiff in the standing room only holding cell a second time comported with the Eighth Amendment.  Therefore, summary judgment should be denied as to plaintiff's excessive force claim against Defendant Pierce for the third incident.

7.   *Fourth Incident Against Defendant Pierce:  Stress Position*

Plaintiff's excessive force claim against Defendant Pierce for the fourth incident is based on when plaintiff was allegedly placed in a stress position, which is based on plaintiff's claim that defendant Pierce pummeled plaintiff's head while plaintiff was being placed in stress restraints, and that plaintiff was held in the stress restraints for six hours.

a.   "Pummeling" Allegation

In the complaint, plaintiff contends that defendant Pierce "pummeled" the back of plaintiff's head with clenched fists while officers carried out Pierce's orders to put plaintiff in the stress position.  Compl. ¶ 15.  In his declaration, defendant Pierce does not directly deny that he pummeled the back of plaintiff's head.  See Pierce Decl., passim.  Instead, defendant Pierce declares that after he and Ortega put plaintiff onto the rolling gurney, Pierce instructed staff to escort plaintiff to the B Facility contraband area and apply soft restraints to protect plaintiff from himself, and that concluded Pierce's involvement with the incident.  Pierce Decl. ¶¶ 19-20.  In his opposition, plaintiff did not address his claim that defendant Pierce pummeled plaintiff's head.  Pl. Opp'n, passim.  Plaintiff also did not rebut or address defendant Pierce's declaration that Pierce's involvement concluded once Pierce ordered the application of soft restraints.

If defendant Pierce was not present while the soft restraints were being applied, he could not have pummeled the back of plaintiff's head while plaintiff was restrained with handcuffs and leg irons.  But if the jury finds defendant Pierce was present, the jury will have to determine whether defendant Pierce pummeled plaintiff's head.

Because the Court is presented with a dispute of material fact as to what happened during

the fourth incident, including whether defendant Pierce was present when the restraints were applied to plaintiff, the Court finds that summary judgment is inappropriate as to the excessive force claim against defendant Pierce based on the alleged pummeling in the fourth incident.

b.      Lengthy Stress Restraint

To the extent plaintiff intended his excessive force claim for the fourth incident to include his allegation that he was retained in overtight stress restraints for six hours, such claim fails based on the evidence.  As noted in UDF 10, because the third incident ended around 1:35 p.m., and plaintiff reported to medical around 2:35 p.m., the record evidence demonstrates that plaintiff was not held in the stress position for six hours.  Rather, after considering the video evidence of the third incident and the subsequent medical record, the Court finds it undisputed that plaintiff was restrained to the gurney for about an hour.  UDF 8, 11.  This length of such restraint does not offend the Eighth Amendment.  See Sheppard, 2008 WL 902202 at *4.

In addition, as argued by defendants, the record reflects plaintiff's own claims conflict as to the length of time he was restrained on the gurney.  For example, following the third incident, plaintiff was seen in medical at 2:35 p.m. where plaintiff reported he had been held in a "torture position for 2 hours."  Goldstein Decl., Ex. 6.  At the end of the day on February 21, 2020, during his use of force interview, plaintiff first stated that he was restrained for over three and a half hours.  Use of Force Interview Video at 7:58.  Plaintiff later said it was for three hours.  Id. at 8:06.  In Grievance 720, plaintiff claimed he was restrained for four hours.  UDF 17.  In his complaint, plaintiff declared he was restrained for six hours.  Pl. Compl. ¶ 18.  Finally, in his deposition, he testified he was restrained for five or six hours.  Pl. Dep. at 43:22-24.  Plaintiff does not address such conflicts in his opposition.  See Pl. Opp'n, passim.

Critically, plaintiff adduced no evidence that defendant Pierce was responsible for the length of time plaintiff was restrained in the stress position.  Rather, plaintiff was restrained until he could be seen by medical.

Therefore, the Court finds that defendant Pierce is entitled to summary judgment as to the excess force claim for the fourth incident based on the stress restraint allegation.

/ / /

33

1        *8.      Qualified Immunity*

2        Defendants Pierce and Lebeck contend they are entitled to qualified immunity on

3    plaintiff's excessive force claims because they reasonably believed plaintiff's claim that he was

4    suicidal and homicidal, and  plaintiff resisted "defendants' attempts to establish and maintain

5    control over him and have him medically evaluated."  Defs. Mem. at 13.  Plaintiff counters that

6    his Constitutional rights were clearly established, and any reasonable person would have known

7    their conduct was illegal.  Pl. Opp'n at 5 (ECF No. 65 at 6).

8                         a.      Legal Standard for Qualified Immunity

9        "The doctrine of qualified immunity protects government officials 'from liability for civil

10   damages insofar as their conduct does not violate clearly established statutory or constitutional

11   rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223,

12   231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity

13   shields an officer from liability even if his or her action resulted from "'a mistake of law, a

14   mistake of fact, or a mistake based on mixed questions of law and fact.'"  Id. (quoting Groh v.

15   Ramirez, 540 U.S. 551, 567 (2004)).

16       "Determining whether officials are owed qualified immunity involves two inquiries:

17   (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged

18   show the official's conduct violated a constitutional right; and (2) if so, whether the right was

19   clearly established in light of the specific context of the case." Robinson v. York, 566 F.3d 817,

20   821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  A right is "clearly

21   established" when, "at the time of the challenged conduct, the contours of a right are sufficiently

22   clear that every reasonable official would have understood that what he is doing violates that

23   right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S.

24   635, 640 (1987)).

25       The qualified immunity analysis is separate from the Eighth Amendment excessive force

26   analysis.  See Marquez v. Gutierrez, 322 F.3d 689, 691 (9th Cir. 2003).  Thus, a guard can do an

27   act which would violate an inmate's Eighth Amendment right but still be entitled to qualified

28   immunity if a reasonable officer in his position would have believed that his response was a good

faith effort to restore discipline.  Id. at 692-93.  Courts must be "hesitant 'to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.'"  Id. at 692 (quoting Whitley, 475 U.S. at 320).

b.    Discussion

Defendants contend they are entitled to qualified immunity based on their version of the facts.  However, as discussed above, the Court finds that there are genuine disputes of material facts.  When analyzing defendants' claim to qualified immunity, the Court must view the facts in the light most favorable to plaintiff.  Saucier, 533 U.S. at 201.  When viewing the facts in the light most favorable to plaintiff, defendants used excessive force during the first incident, as well as when attempting to place plaintiff into the standing room only holding cell on two separate occasions, despite plaintiff's objections that his back had gone out and he was unable to stand.  Such uses of force caused plaintiff significant pain, some abrasions, and aggravation of plaintiff's pre-existing chronic back and neck pain for which he receives medication.  While defendants contend that their actions were taken in furtherance of legitimate penological interests, plaintiff disputes such claims.

Accordingly, defendants' actions, as alleged by plaintiff, were violations of plaintiff's Eighth Amendment rights and plaintiff's rights were clearly established by Whitley, 475 U.S. at 312 (unnecessary and wanton infliction of pain against prisoner violates Eighth Amendment) and Hudson, 503 U.S. at 6-7 (1992) (prisoners have an Eighth Amendment right to be protected from the use of excessive force).  The Court therefore finds that defendants are not entitled to qualified immunity on plaintiff's excessive force claims.

G.    First Amendment Retaliation Claims Against Defendants Pierce and Lebeck

The complaint alleges First Amendment retaliation claims against defendants Pierce and Lebeck based on plaintiff's allegation that defendant Lebeck told plaintiff "you want to cry to the Ombudsman, we'll give you something to cry about."  Compl.  ¶ 6.  Defendants move for summary judgment on the retaliation claim because they were not aware of the alleged protected conduct (i.e., that plaintiff was interviewed by a prison Ombudsman).

/ / /

1      *1.* The Parties' Positions

2        a. <u>Defendants' Motion for Summary Judgment</u>[15]

3   Both defendants Lebeck and Pierce deny that they were aware plaintiff was interviewed

4 by Ombudsman Bolden prior to the incidents on February 21, 2020.  Pierce Decl. ¶ 22; Lebeck

5 Decl. ¶ 7.  Defendants contend that plaintiff can present no evidence rebutting their declarations.

6 Defs. Mem. at 11.  Further, defendants argue that they used force because plaintiff told them he

7 was suicidal and homicidal and resisted their efforts to restrain him so they could take him for a

8 medical evaluation.  <u>Id.</u>  Because their use of force was for a legitimate penological purpose,

9 defendants argue they are entitled to summary judgment on plaintiff's retaliation claims.  <u>Id.</u> at

10 10-11 (citing <u>Gabalis v. Plainer</u>, 2010 WL 4880637, at *9 (E.D. Cal. Nov. 23, 2010) (granting

11 summary judgment on claims that excessive force was used in retaliation because defendants

12 "acted in the face of continued resistance from plaintiff while being escorted")).

13        b. <u>Plaintiff's Opposition</u>

14   In his opposition, plaintiff argues that because defendants' use of force was committed in

15 retaliation, it was per se excessive.  Pl. Opp'n at 1 (ECF No. 65 at 2).  Plaintiff claims that when

16 force is used in retaliation, "it cannot be said that such force was used for any other reason but

17 to[] sadistically and maliciously cause harm."  <u>Id.</u> (citing <u>Hudson</u>, 503 U.S. at 7).  Plaintiff also

18 claims that "the malicious and sadistic use of force to cause harm always violates contemporary

19 standards of decency in violation of the Eighth Amendment."  Pl. Opp'n at 2 (ECF No. 65 at 3)

20 (quoting <u>Whitley</u>, 475 U.S. at 327).  Further, plaintiff argues that there is a dispute of material

21 fact precluding summary judgment because Lebeck's statement referring to "crying to the

22 Ombudsman" shows Lebeck's state of mind under <u>Hudson</u>, 503 U.S. at 1.  Pl. Opp'n at 1-2 (ECF

23 No. 65 at 2-3).  Plaintiff contends such statement demonstrates defendant Lebeck's intent to

24 punish plaintiff by using force.

25 _____

26 [15] Defendants did not address plaintiff's claim that after plaintiff told a correctional sergeant that plaintiff wanted to make a staff complaint for excessive force, defendant Pierce retaliated against

27 plaintiff by falsely charging plaintiff with two rules violations (Compl. ¶¶ 13, 25).  <u>See</u> Defs. Mem., <u>passim</u>.  The Court finds that defendants did not move for summary judgment on this

28 claim.

1

c.      Defendants' Reply

2        Defendants dispute plaintiff's interpretation of <u>Hudson</u> and argue that the Supreme Court

3    held that a plaintiff who sustained no significant injury can prevail, as long as the injury is not de

4    minimis, and that the "blows directed at Hudson, which caused bruises, swelling, loosened teeth,

5    and a cracked dental plate, [were] not de minimis."  Defs. Reply at 3 (quoting <u>Hudson</u>, 503 U.S.

6    at 9-10.)  Defendants contend that plaintiff cannot show any non-de minimis injury because he

7    suffered no injuries equivalent to those sustained by the plaintiff in <u>Hudson</u>.  Defs. Reply at 3.

8        Further, defendants contend plaintiff's reliance on a theory that force used in retaliation is

9    per se excessive fails because it misstates the law.  <u>Id.</u>  Instead, "[f]or purposes of a prisoner's

10   Eighth Amendment excessive force claim, infliction of pain totally without penological

11   justification is per se malicious."  <u>Id.</u> (quoting <u>Barrow v. Warden Cal. Med. Facility, Corcoran</u>,

12   2013 WL 5671354, at *3 (E.D. Cal. Oct. 17, 2013), <u>findings and recommendations adopted</u>, 2013

13   WL 6080033 (E.D. Cal. Nov. 19, 2013)).  Defendants argue that there was penological

14   justification for their use of force to subdue and restrain plaintiff based on his "stated suicidality

15   and homicidality and his refusal to submit to restraints or enter a holding cell."  <u>Id.</u>

16          *2.      Legal Standard Governing Plaintiff's First Amendment Claims*

17       "Prisoners have a First Amendment right to file grievances against prison officials and to

18   be free from retaliation for doing so."  <u>Watison v. Carter</u>, 668 F.3d 1108, 1114 (9th Cir. 2012)

19   (citing <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009)).  A viable retaliation claim in the

20   prison context has five elements:  "(1) An assertion that a state actor took some adverse action

21   against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4)

22   chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

23   advance a legitimate correctional goal."  <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir.

24   2005).

25          *3.      Discussion*

26       In his opposition, plaintiff relies on defendant Lebeck's alleged statement concerning

27   "crying to the Ombudsman" to show that defendant Lebeck had a motive to retaliate against

28   plaintiff.  Pl. Opp'n at 2 (ECF No. 65 at 3).  In his deposition, plaintiff testified that about a week

37

before the underlying incidents, Ombudsman Bolden was conducting private, confidential interviews with inmates.  Pl. Dep. at 53:2-19.  Plaintiff was unaware whether any investigation or further interviews were conducted and had heard nothing in follow-up or response to his interview with Bolden.  Pl. Dep. at 55:5-56:1.  Plaintiff also testified that defendant Lopez was working on the day plaintiff wanted to talk to the Ombudsman, and responded yes when asked if Lopez witnessed the Ombudsman walk the facility.  Pl. Dep. at 56:21-57:1.

Both defendants deny they were aware that plaintiff met with Ombudsman Bolden prior to February 21, 2020.

Under the third element of the <u>Rhodes</u> analysis, plaintiff must show that his protected conduct was "the substantial or motivating factor" behind the actions of defendants Lebeck and Pierce.  <u>See</u> <u>Brodheim</u>, 584 F.3d at 1271 (citing <u>Soranno's Gasco, Inc. v. Morgan</u>, 874 F.2d 1310, 1314 (9th Cir. 1989)).  To make this showing, plaintiff must demonstrate that defendants Lebeck and Pierce knew of the protected conduct <u>and</u> that either (1) there was proximity in time between the protected conduct and the allegedly retaliatory action, (2) that defendants expressed opposition to the speech, or (3) defendants' proffered reason for the adverse action was pretextual.  <u>Corales v. Bennett</u>, 567 F.3d 554, 568 (9th Cir. 2009) (citation and emphasis omitted).

Here, plaintiff adduces no evidence that defendant Lebeck or defendant Pierce was aware of plaintiff's meeting with Ombudsman Bolden before the February 21, 2020 incidents.  Plaintiff's speculation as to the meaning of defendant Lebeck's statement, absent evidence to support such nexus, is insufficient.

Further, plaintiff's allegations related to defendant Lopez are insufficient and do not save plaintiff's First Amendment claim against defendants Lebeck and Pierce.  For example, plaintiff's allegation that defendant Lopez was working on the day the Ombudsman was walking the facility is insufficient to demonstrate that Lopez was aware plaintiff met with Bolden.  And even assuming defendant Lopez saw the Ombudsman walk the facility, there is no evidence that Lopez saw plaintiff be taken for an interview or knew plaintiff was interviewed by Bolden.  Importantly, plaintiff also testified that Lopez did not appear at the first use of force incident until plaintiff was

38

already on the ground.  Pl. Dep. at 24:25-25:7.  Thus, even if defendant Lopez, who did not make the Ombudsman comment to plaintiff, was aware of plaintiff's interview, there is no evidence that Lopez's awareness instigated the initial use of force by defendants Pierce and Lebeck.  Further, there is no evidence that defendant Lopez told defendants Lebeck or Pierce about such interview even if Lopez was aware of plaintiff's interview with Bolden.

While timing can be considered circumstantial evidence of retaliatory intent, plaintiff met with the Ombudsman a week before the incidents at issue here, so a retaliatory inference is not as strong as it would be if the timing were more immediate.  "Retaliation is not established simply by showing adverse activity by the defendant after the exercise of protected speech; rather, plaintiff must show a nexus between the two."  Robins v. Lamarque, 2011 WL 6181435 at *8 (N.D. Cal. Dec. 13, 2011) (citing Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000)).

Moreover, plaintiff's speculation that defendant Lebeck's comment demonstrates Lebeck knew about plaintiff's interview with the Ombudsman is not sufficient to create a material issue of fact sufficient to deny the motion for summary judgment.  See Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."); Nelson v. Pima Cmty. College, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

Thus, the Court recommends that defendants' motion for summary judgment be granted on plaintiff's claim that defendants Lebeck and Pierce retaliated against plaintiff for meeting with Ombudsman Bolden because plaintiff failed to show there is a genuine issue of material fact regarding defendants' knowledge of plaintiff's protected conduct.  See Corales, 567 F.3d at 568 (affirming grant of summary judgment to defendants when plaintiffs failed to raise a triable issue of fact showing either constitutionally protected activity or retaliatory motive); Wood, 753 F.3d at 904-05 (affirming summary judgment absent evidence that defendants knew about plaintiff's prior lawsuit); Davis v. Harris, 2022 WL 584211, at *5 (E.D. Cal. Feb. 25, 2022) (granting summary judgment on retaliation claim because plaintiff failed to adduce evidence that defendant Hunter knew plaintiff had filed a grievance); Cejas v. Paramo, 2017 WL 1166288, at *6 (S.D.

Cal. Mar. 28, 2017) (finding inmate failed to state retaliation claim because he failed to allege sufficient causal connection between protected conduct and challenged actions); Halloum v. Ryan, 2014 WL 1047144 at *7 (D. Ariz. Mar. 18, 2014) (granting summary judgment where plaintiff submitted no probative evidence that defendant was aware of plaintiff's protected conduct).

### 4.    Conclusion

Because plaintiff failed to adduce competent evidence to rebut the declarations of defendants Lebeck and Pierce that they were unaware of plaintiff's interview with the Ombudsman prior to the February 21, 2020 incidents, defendants are entitled to summary judgment on plaintiff's retaliation claims as to incidents one through four.

### H.    Damages

In his complaint, plaintiff seeks compensatory, nominal, and punitive damages, as well as costs of suit.  Compl. at 6.

### 1.    Punitive Damages

Defendants contend they are entitled to summary judgment on plaintiff's prayer for punitive damages because it is undisputed that defendants did not act with evil motive or intent or reckless and callous indifference to plaintiff's rights.  Defs. Mem. at 13, citing Smith v. Wade, 461 U.S. 30, 56 (1983).  Plaintiff counters that defendants' conduct was motivated by evil and callous indifference to plaintiff's rights.  Pl. Opp'n at 6, citing Wade, 461 U.S. at 56.

If a jury finds a constitutional violation, "an award of nominal damages is mandatory, not permissive."  Floyd v. Laws, 929 F.2d 1390, 1403 (9th Cir. 1991); see also George v. City of Long Beach, 973 F.2d 706, 708 (9th Cir. 1992) ("In this Circuit, nominal damages must be awarded if a plaintiff proves a violation of his constitutional rights.")  Further, whether punitive damages are warranted is an issue reserved for the jury.  See Wade, 461 U.S. at 54 ("punitive damages are awarded in the jury's discretion").  Based on the facts presented by plaintiff, a reasonable jury could conclude that defendants acted with evil intent or a "reckless or callous indifference to [plaintiff's] federally protected rights."  Id. at 56.

Genuine issues of material fact exist as to whether defendants violated plaintiff's Eighth

1    Amendment rights.  If a jury finds in plaintiff's favor, plaintiff could recover compensatory,

2    nominal, and punitive damages based on this alleged constitutional violation.  The Court

3    recommends that defendants' motion for summary judgment as to plaintiff's request for punitive

4    damages be denied.

5                    2.    *Mental or Emotional Distress Damages*

6         Defendants also argue that plaintiff cannot recover damages based on mental or emotional

7    distress claim because any physical injuries he sustained were de minimis.  Defs. Mem. at 13

8    (citing 42 U.S.C. § 1997e(e)).

9         Section 1997e(e) of the PLRA provides that "[n]o Federal civil action may be brought by

10   a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury

11   suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

12   Section 1997e(e) prohibits the recovery of compensatory damages for mental or emotional

13   injuries unless the prisoner has suffered a physical injury that is more than de minimis.  Oliver,

14   289 F.3d at 626-28.  In Oliver, the court found that a prisoner's back and leg pain from sitting and

15   sleeping on the bench and floor of a temporary cell was merely de minimis injury.  On the other

16   hand, in Pierce v. County of Orange, 526 F.3d 1190, 1224 (9th Cir. 2008), the Ninth Circuit

17   determined that bed sores and bladder infections were more than de minimis.

18        However, the absence of an observable medical condition requiring treatment by a

19   medical professional does not necessarily render plaintiff's injuries de minimis.  In Oliver, the

20   Ninth Circuit stated:

21              Appellees . . . argue that de minimis "physical injury" under
               § 1997e(e) should be understood as "an observable or diagnosable
22             medical condition requiring treatment by a medical care
               professional," which would cause a "'free world person' to seek such
23             treatment."  If appellant's proposed standard requires too little,
               appellee's proposed standard requires too much.
24

25   Oliver, 289 F.3d at 628 (quoting Luong v. Hatt, 979 F. Supp. 481, 486 (N.D. Tex. 1997))

26   (internal citations omitted).

27        Here, plaintiff alleges he sustained multiple abrasions, some of which can be seen during

28   the post force interview video.  Plaintiff claims he suffered back and neck pain, and the injuries

                                              41

exacerbated his chronic back and neck pain.  Pl. Dep. at 57:5-16.  The Court finds that plaintiff's injuries are more akin to the injuries discussed in <u>Pierce</u> than the injuries that were "nothing too serious" in <u>Oliver</u>.  <u>See Oliver</u>, 289 F.3d at 629 ("on deposition [the plaintiff] testified that '[his injury] was nothing too serious' and that he did not seek medical treatment.").  Here, even if plaintiff did not suffer any diagnosable injury that necessitated medical treatment, plaintiff's alleged injuries are more than de minimis.  Plaintiff was already on pain medication for his chronic back pain, and at the 1:06 p.m. medical exam, the doctor prescribed plaintiff an additional 650 mg of Tylenol for five days and ordered a follow up with the RN in the morning.  Goldstein Decl., Ex. 4.  At that time, plaintiff reported his back pain was 8/10.  <u>Id.</u>  Thus, plaintiff's claim for compensatory damages for his emotional injuries is not barred by the PLRA.  The Court recommends that defendants' motion for summary judgment as to plaintiff's request for mental or emotional distress damages be denied.

IV.    DISMISSAL OF DOE DEFENDANTS AND LEAVE TO AMEND

The complaint included two Doe defendants, an unknown mental health clinician and an unidentified prison administrator.  Following review of the record, including the evidence submitted in support of summary judgment as to exhaustion of administrative remedies, the Court sua sponte recommends dismissing these two unidentified defendants without leave to amend because amendment would be futile.  <u>See Craig v. United States</u>, 413 F.2d 854, 856 (9th Cir. 1969) (district court may dismiss Doe defendants sua sponte).

A.    <u>Unknown Mental Health Clinician</u>

In his claim for deliberate indifference, plaintiff also alleges that an unknown mental health clinician was deliberately indifferent to plaintiff's attempted suicide.  Compl. ¶¶ 17-22.  It does not appear that plaintiff took any efforts to identify the unknown mental health clinician and did not seek to amend his complaint to name the clinician as a defendant.  The discovery and pretrial motions deadlines expired in 2023.  (ECF No. 48.)  In light of plaintiff's failure to timely seek to identify this clinician or to seek leave to amend to name the clinician, the dismissal of the unknown mental health clinician is appropriate.  <u>See</u> Fed. R. Civ. P. 4(m), 15(c); <u>see also Becker v. Oregon</u>, 170 F. Supp. 2d 1061, 1069 (D. Or. 2001) (where plaintiff given ample time to

discover identities of Doe defendants, motion to dismiss Doe defendants granted); Velazquez-Martinez v. Colon, 961 F. Supp. 362 (D. P.R. 1997) (court dismissed sua sponte "Doe" defendants when complaint was submitted 18 months earlier, and plaintiffs did not since that time substitute fictitious defendants to be able to serve summons); Clark v. McMillin, 932 F. Supp. 789 (S.D. Miss. 1996) (John Doe defendant dismissed after failure to amend to identify and name defendant during nine months case was pending and following completion of discovery); Carmona Pacheco v. Betancourt Y Lebron, 820 F. Supp. 45, 46 (D. P.R. 1993) (dismissed action against John Doe defendants not served within 120 days).

Moreover, the evidence provided by the appearing defendants demonstrates that in Grievance 720 plaintiff did not identify a mental health clinician by name or title and did not otherwise claim that a mental health clinician was deliberately indifferent to plaintiff's attempted suicide.  Therefore, it would be futile to grant plaintiff leave to amend to name such mental health clinician, because the record evidence demonstrates that plaintiff failed to exhaust administrative remedies as to such claim.  Plaintiff's claims against the unknown mental health clinician should be dismissed without prejudice.

B.    Unidentified Prison Administrator

In the initial screening order, the assigned magistrate judge noted that plaintiff named another Doe defendant, "unidentified prison administrator at High Desert State Prison," alleging in plaintiff's fourth claim for relief a violation of his due process rights in connection with his initial placement in administrative segregation.  (ECF No. 5 at 2.)  The magistrate judge found that because plaintiff was transferred to High Desert State Prison ("HDSP") after the February 21, 2022 use of force at CSP-SAC, any due process violation that occurred at HDSP is unrelated to the incidents at issue here.  (Id.) (citing Fed. R. Civ. P. 20(a)).  Further, defendants Pierce, Lebeck and Lopez were not involved in plaintiff's placement in administrative segregation at HDSP, and they were relieved of any obligation to respond to such allegations.  (ECF No. 5 at 3.)  Plaintiff was informed that he "must file a separate civil rights complaint challenging his placement in administrative segregation at HDSP on February 22, 2020."  (Id.)  It was also noted that service of process on the unidentified prison administrator could not occur until plaintiff identified the

administrator and provided the name and address in his separately filed civil rights complaint.

(Id. at 3 n.2.)  Therefore, the unidentified prison administrator and plaintiff's fourth claim should

be dismissed without prejudice.  See Craig, 413 F.2d at 856.

V.    CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

A.  Defendants' motion for summary judgment (ECF No. 61) be **partially granted** as

follows:

1.  Defendant Pierce be granted summary judgment on plaintiff's second claim that

defendant Pierce was deliberately indifferent to plaintiff's serious mental health needs in

violation of the Eighth Amendment, and such claim be dismissed without prejudice based

on plaintiff's failure to exhaust administrative remedies.

2.  Defendant Lebeck be granted summary judgment on plaintiff's claim that

Lebeck used excessive force during the second incident, and the claim be dismissed with

prejudice.

3.  Defendant Pierce be granted summary judgment on plaintiff's excessive force

claim that he was restrained for six hours after the fourth incident, and the claim be

dismissed with prejudice.

4.  Defendants Pierce and Lebeck be granted summary judgment on plaintiff's

First Amendment retaliation claims as to the first through fourth incidents of alleged

excessive force, and the retaliation claims based on the alleged Ombudsman's comment

be dismissed with prejudice.

In all other respects, defendants' motion for summary judgment should be **denied**.

B.  Plaintiff's claims against the unknown mental health clinician should be **dismissed**

**without prejudice**; and

C.  The unidentified prison administrator and plaintiff's fourth claim against this

unidentified prison administrator should be **dismissed without prejudice**.

D.  The above recommendations leave the following **claims remaining** after summary

judgment:  excessive force claim against defendants Pierce, Lebeck and Lopez based on the first

44

incident (initial encounter); excessive force claim against defendant Pierce based on the second

incident (initial placement in standing room only holding cell); excessive force claim against

defendant Pierce based on the third incident (placement in standing room only holding cell);

excessive force claim against defendant Pierce based on the fourth incident (pummeling during

stress position); and retaliation claim against defendant Pierce based on the fourth incident

(falsely charging plaintiff with two rules violations), see supra n.15.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

objections shall be filed and served within fourteen days after service of the objections.  The

parties are advised that failure to file objections within the specified time may waive the right to

appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 14, 2024

CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

/1/murp1789.msj.rev